Randolph D. Rouse v. Commissioner. Audrey C. Six (formerly Audrey C. Rouse) v. Commissioner.
Rouse v. Commissioner
Docket Nos. 3062-62 and 3189-62.
United States Tax Court
T.C. Memo 1964-297; 1964 Tax Ct. Memo LEXIS 41; 23 T.C.M. (CCH) 1823; T.C.M. (RIA) 64297; November 17, 1964
Fred R. Tansill, 824 Connecticut Ave., N.W., Washington, D.C., and Louis Hoppe, for the petitioners. Stuart E. Seigel, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent issued identical notices of deficiency to each of the petitioners herein in which he determined deficiencies in income tax for the years 1956 and 1957 in the respective amounts of $39,535.83 and $15,758.56. Several of the issues raised in the pleadings, some of which were before us in Randolph D. Rouse, 39 T.C. 70, have been settled by stipulation and will be given *42 effect in a Rule 50 computation. The only issue presented for our decision is whether respondent correctly determined that petitioners were not entitled to deduct on their joint income tax return for the year 1956 $40,000 claimed as a business bad debt. In the statements attached to the notices of deficiency respondent stated as grounds for his determination that the amount in issue did not constitute a business bad debt, and that such debt did not become completely worthless in 1956 so that "no portion of the debt is allowable as a short-term capital loss under the provisions of Section 166(d) of the Internal Revenue Code which is applicable to nonbusiness bad debts." In an amended answer respondent also alleged in the alternative that the amount in issue constituted (1) a capital contribution by petitioner Randolph D. Rouse to Crescent Construction Corporation, or (2) a gift or nondeductible personal expenditure by petitioner Randolph D. Rouse, or (3) an indebtedness between petitioner Randolph D. Rouse and his wholly-owned corporation, Fourth Citadel Construction Corporation, or (4) in the event that a valid debt was created to petitioner Randolph D. Rouse *43 by Crescent Construction Corporation it was voluntarily extinguished and cancelled so that it is nondeductible as determined by respondent. In the petitions it is alleged in the alternative that if petiitoners are not entitled to a business bad debt deduction for 1956, as claimed on their return for that year, then such deduction is allowable for the year 1957. In their reply to respondent's amended answer petitioners allege that if an indebtedness was created between petitioner Randolph D. Rouse and his wholly-owned corporation, Fourth Citadel Construction Corporation, then such indebtedness became worthless in 1956 and 1957 and constituted a business bad debt owed to him. Findings of Fact Some of the facts have been stipulated and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein and made a part of our Findings by this reference. Petitioners were married on May 26, 1956, and thereafter, during the years in issue, resided in Arlington, Virginia. They were divorced in 1959. The former Audrey Cotter Rouse was married to Robert F. Six in 1961 and resided in Denver, Colorado, at the time of filing her petition herein. The petitioners *44 filed joint Federal income tax returns for the years 1956 and 1957 with the district director of internal revenue at Richmond, Virginia. Petitioner Audrey C. Six is a party herein only by virtue of having filed joint returns for the years 1956 and 1957 with Randolph D. Rouse. There is no controversy herein concerning any of the separate income of Audrey C. Six earned and reported by her on said joint returns. References hereinafter made to petitioner will be to Randolph D. Rouse. During the taxable years here involved petitioner was engaged as a builder and building consultant. He was also an officer in various building corporations active in various sections in northern Virginia. These companies were engaged in the construction of commercial and residential properties. Operating through various corporations in which he had an interest petitioner has built over 1,000 houses. Petitioner also had other business interests, including breeding, training, and racing horses. Since 1957 he has been a director and a member of the executive committee of the Fairfax County National Bank. He owned and rented commercial and residential properties during the taxable years. Petitioner conducted *45 several of his business enterprises in the form of a sole proprietorship known as Randolph D. Rouse Enterprises. Petitioner's younger brother, William D. Rouse, sometimes hereinafter referred to as William, came to the Washington, D.C., area in 1951 and worked as a construction superintendent for various corporations owned principally by petitioner. While working as a construction superintendent William formed Century Construction Corporation, sometimes hereinafter referred to as Century, in 1952 to engage in the business of developing and selling lots in Fairfax, Virginia. William was president and chief stockholder of Century. The other stockholders were Parke S. Rouse, Sr., and Pauline D. Rouse, his mother and father, his brother, Parke S. Rouse, Jr., and Anne C. Rouse, the widow of a brother, DeSchiell Rouse. Petitioner was never a stockholder in Century. However, he sponsored its formation and guided its operations because he was interested in seeing his youngest brother do well in his first business venture. Petitioner sold to Century land valued at approximately $80,000 for which he accepted a first trust note. In August 1953 William resigned as president of Century in order *46 to form another corporation to engage in the business of building houses. This corporation was known as Crescent Construction Corporation, and will sometimes hereinafter be referred to as Crescent. It was chartered on August 20, 1953, and its stock was issued on that date as follows: Number
of Shares
William
60
Pauline D. Rouse and/or Parke S.
Rouse, Sr.
20
Parke S. Rouse, Jr.
10
Anne C. Rouse
10
Total
100 These 100 shares of stock represent all the issued and outstanding stock of Crescent from the date of its incorporation to the present time. The stockholders were the same individuals who were the stockholders in Century. Petitioner was not a stockholder in Crescent and he had no knowledge of the existence of the corporation when it was formed. William paid $6,000 to Crescent in exchange for the stock issued to him. Anne C. Rouse paid $1,000 and Parke S. Rouse, Sr., and Pauline Rouse paid $2,000 to Crescent for the stock issued to them. In all, Crescent received $10,000 for the 100 shares of stock it issued. Crescent also received on August 25, 1953, $2,000 from William as a loan. Over $7,000 of the amount which William paid to Crescent was obtained *47 from Century in settlement of various claims William had against that corporation. No part of the funds given to Crescent upon its organization came directly or indirectly from petitioner. At the time of Crescent's incorporation William was its president, Parke S. Rouse, Sr., was its vice president, Pauline D. Rouse was its secretary-treasurer, and William's wife, Irene, was its assistant secretary-treasurer. These individuals also constituted Crescent's first board of directors. Soon after the formation of Crescent petitioner learned from conversations with members of his family that they had formed a corporation to engage in the business of building houses. Petitioner did not believe it was prudent for them to do so because they were people of limited financial resources, and because he believed that his brother William lacked sufficient experience to successfully engage in the building business without the guidance which petitioner previously had given him. Crescent's first project was the construction of a house on a lot bought from Century. Petitioner held a first trust note on the lot and he was paid $1,250 for it and $50 in interest. In 1954 Crescent purchased land and *48 constructed four houses near Falls Church, Virginia. Three of the houses were sold and William and his wife purchased the fourth house, which they shortly thereafter sold. On April 8, 1954, Crescent entered into a sales contract with Normandy Land Club, Inc., sometimes hereinafter referred to as Normandy, to purchase 20 developed lots in a subdivision located south of Alexandria, Virginia, and known as Somerville Hill. Normandy was the wholly-owned corporation of James William Somerville, sometimes hereinafter referred to as Somerville. Crescent agreed to purchase 6 lots within 90 days and gave a deposit of $1,000 therefor. Crescent also obtained an option to purchase 8 additional lots for a period of 6 months from the date of first settlement under the contract, and a second option to purchase the remaining 6 lots for a period of 12 months from the date of first settlement under the contract. The selling price for each lot was $2,000, of which Crescent agreed to pay $800 in cash at the date of conveyance. In payment of the remainder of the purchase price for each lot Crescent agreed to assume payment of first deeds of trust, each in the amount of $1,200, to be placed on the land *49 by Somerville. The first deeds of trust bore interest at the rate of 6 percent per annum, and were payable in full within 3 years from March 30, 1954, or upon the sale and settlement of each house built by Crescent, whichever occurred sooner. Normandy agreed to subordinate the first deeds of trust to any construction loans obtained by Crescent. Upon a cash outlay of $3,905.12 Crescent obtained the first 6 lots on July 22, 1954. It exercised its options to obtain 8 lots on January 21, 1955, and the remaining 6 lots on June 15, 1955. The sales contract between Crescent, as purchaser, and Normandy, as seller, dated April 8, 1954, contained the following paragraph: Seller agrees to blacktop and install concrete curb and gutter on both sides of streets which the subject group of lots abuts, and to do so according to Fairfax County, State, and V.A. requirements for finished roads, including their drainage. Seller agrees to install storm sewers and usable sewer trunk lines connected to County sewer, and to install water lines. Sewer and water lines shall not cross lots (unless required by public officials), and shall be installed to a point within twenty-five feet of each subject lot. *50 All improvements described in this paragraph shall be installed and approved in accordance with applicable State, Veterans Administration, and County requirements and this shall be done as to any subject group of lots prior to completion of the first house in the subject group. Where Veterans Administration inspection is made, the final Veterans Administration inspection date shall be the date of completion. With reference to existing and other roads to be finished, the Seller agrees to maintain them comparable to State maintenance until such time as they may be finally accepted into the State Road system and this provision of this contract shall run to the benefit of the Purchaser and its vendees. Petitioner had no knowledge of and he did not approve or disapprove of Crescent's dealings with Normandy. Following the execution of the April 8, 1954, sales contract, William took the necessary steps to begin construction of the 20 houses by first attempting to secure VA and FHA approval and financing for the project. Negotiations incident to obtaining VA and FHA approval and construction loans for the venture extended over a longer period of time than William anticipated, and the obtaining *51 of such approval and financing was more difficult than he expected. Objections were raised as to his lack of financial resources and experience. William intended to build the houses in three groups and thereby build up the capitalization of Crescent. He contemplated building on the first 6 lots to which he took title on July 22, 1954, completing and selling out that project within 6 months, then using the proceeds and profits for the next group of 8 lots to which he would take title in January 1955, and finally, upon completion of this section, the profits and same capital would be used for the last 6 houses in the project, title to the land for which was scheduled to be taken in June 1955. William hoped to duplicate insofar as possible the success his brother, petitioner herein, had enjoyed previously by starting in the building business with limited capital. The delay in obtaining VA and FHA approval and a definite commitment for construction loans, however, depleted Crescent's capitalization. At the end of 1954, prior to the time when construction on the houses began, it was necessary for Crescent to pay to Normandy $5,354.95 in order to exercise the option to obtain the second *52 group of 8 lots. Crescent did not have sufficient funds to make the payment. William was able to obtain an oral commitment from the FHA to approve the project and from a financing company to provide construction loans, subject to getting petitioner into the project to lend it credit. William approached his brother, petitioner herein, to supply the needed funds and credit. Crescent and William had no source other than petitioner for such funds and credit. William presented to petitioner the opportunity to participate in and share the profits of the venture in which all engineering and house plans had been completed, and tentative and conditional financing arrangements and VA and FHA approval had been secured. It was assumed by both petitioner and William that all that remained to be done was to construct houses on lots fully developed by Normandy and available to Crescent pursuant to its option. In December 1954 or January 1955 petitioner accepted William's proposal and agreed to advance money and credit to accomplish the venture proposed by William. He did so without making any inquiry with respect to the financial ability of Normandy or Somerville. Although he became a vice president *53 and director of Crescent on December 31, 1954, he did not become a stockholder of Crescent. William did not offer petitioner any stock in the corporation because he was anxious to keep Crescent distinct from any of petitioner's enterprises in order to make a name for himself as a successful builder. Petitioner anticipated that he would advance approximately $12,000 to the venture plus some additional amounts which might be necessary for the purchase of material on a cash-discount basis. The estimate of $12,000 was arrived at as follows: The FHA and VA set a price of $14,395 on 17 houses, and $14,650 on 3 houses which were on corner lots. Gross income therefore would be $288,665. Petitioner analyzed construction costs for the project and determined that the profit would be approximately $40,000, which meant that approximately $248,000 in funds was needed to complete the project. Petitioner computed the amount of working capital required for the proposed venture as follows: Costs such as salesmen's commissions and legal fees, which amounted to approximately $10,000, would be paid at the time of sale of the houses and would not have to be supplied by the builder. In addition, notes *54 in the total principal amount of $24,000, which had been given to Normandy as part of the purchase price for the land, were not due and payable until the houses were sold or 3 years after their date of execution, whichever occurred sooner. Subtracting the amounts of $10,000 and $24,000, not due and payable until the houses were completed, from the total cost of the project, $248,000, resulted in approximately $214,000 needed to begin the project. William had obtained tentative construction loan commitments from Frederick W. Berens, Inc., at $9,600 per house, or a total of $192,000 for the 20 houses. Subtracting $192,000 from $214,000 left $22,000 required to be financed by Crescent. Crescent had approximately $10,000 from its original capitalization and from its profits on previous projects. [1] Thus petitioner and William estimated that the venture would require an additional sum of approximately $12,000 as working capital. In December 1954 or January 1955, when petitioner agreed to enter *55 into this venture with William, he was confident that it would result in a quick profit of $40,000, half of which was to be his. On June 7, 1955, petitioner and William signed a memorandum prepared for the guidance of petitioner's accountant. It provided that Crescent and a corporation in which petitioner was the principal stockholder and president, Fourth Citadel Construction Corporation, sometimes hereinafter referred to as Fourth Citadel, were to be equal partners in building on the 20 lots in Somerville Hill. The memorandum of June 7, 1955, further provided as follows: Profits will be split equally by the above Corporations. Procedure to be as follows: (1) Accounting should be made immediately of Crescent and Fourth Citadel books to determine amount spent to date on this project. Salary paid William and Randolph Rouse will be omitted as these salaries will not be considered as building costs of this job. (2) Loans made to Crescent by Rouse Enterprises will bear normal interest. (3) Fourth Citadel will receive all construction loan draws and disperse these funds. (4) Subcontractors will be required to get approval of their bill for services from William Rouse before *56 presenting to Fourth Citadel for payment. (5) All material invoices will be first approved by William Rouse before being paid by Fourth Citadel. (6) Employees and equipment of Randolph Rouse will be sent to Somerville Hills as the jobs needs dictate. (7) Equipment will be rented to Fourth Citadel at standard rates. (8) The employees sent to the project will be billed to Fourth Citadel at their existing rates, plus 10% override, which override covers administrative costs and payroll expenses. No part of the salary of Ken Donahue and Bill Carroll will be charged to this project. (9) Monies will be dispensed from either Crescent or Fourth Citadel to pay all creditors of this project first. As funds become available through construction loans and sales, loans to Crescent and Fourth for land purchase and front money will be repaid in a manner to equalize the equity of each principal. Profit will be distributed only after all investment equity has been repaid. (10) One Thousand dollars will remain undistributed at the termination of the job which sum will serve to pay for work required by builders warranty of construction. By "front money" the parties referred to their own *57 funds which were put into the venture. Petitioner characterized his advances to the venture as loans to Crescent. No provision was made for the sharing of losses, because the possibility of a loss was not contemplated. Among the reasons why petitioner used Fourth Citadel as a vehicle for his participation in the project was because it enjoyed low unemployment compensation rates for purposes of Virginia taxation and thereby reduced the cost of operations, and because it had available manpower and equipment when petitioner became associated with the project in January 1955. For its fiscal year ended October 31, 1955, Fourth Citadel had gross income of $80.10 and expenses of $300.32, and for its fiscal year ended October 31, 1956, Fourth Citadel had no income and no expenses. On January 21, 1955, and June 15, 1955, Randolph D. Rouse Enterprises issued its checks payable to the order of Crescent in the amounts of $6,300 and $5,600, respectively. The checkbook stubs for these checks recite as follows: "Crescent Construction Corp. - Loan." These amounts were used by Crescent to exercise its two options to purchase a total of 14 lots from Normandy. On June 30, 1955, Crescent executed *58 a negotiable note in the principal amount of $11,900 payable to petitioner in 90 days. The note did not provide for the payment of interest. The cash disbursements book of Randolph D. Rouse Enterprises reflects the disbursement of the $6,300 and $5,600 checks as debits in the column headed "Sundry," and each is noted "Loan." The cash receipts book of Crescent reflects the $6,300 and $5,600 checks as a credit to "L/P R. D. Rouse." These were posted as a credit to the ledger account entitled "Notes Payable Randolph D. Rouse." Funds for the payment of services and supplies required for the project were advanced to Fourth Citadel from Randolph D. Rouse Enterprises, petitioner's sole proprietorship. Fourth Citadel was used as the instrument through which bills were to be paid and monies collected. Thus funds advanced from Randolph D. Rouse Enterprises were to be paid back by Fourth Citadel as they became available through construction loans and sales. Fourth Citadel and Crescent maintained parallel books of account. Expenditures made by Fourth Citadel on the Somerville Hill project were reflected on its books as an account receivable from Crescent. As Fourth Citadel made collections they *59 were credited on this account and reduced the accounts payable by Crescent to Fourth Citadel. Construction of all the houses began in approximately June 1955. Although construction of the houses was begun, Normany failed to fulfill its contractual obligations with Crescent to furnish finished lots, including streets, curbing, sewers, and water. Normandy's default was further aggravated by three heavy rainfalls which created flash floods and resulted in the destruction of several basements which had been put in by Crescent. By July 1955 construction of the houses was substantially under way. The only improvement installed by Normandy was a sanitary sewer. It appeared that Somerville Hill would consist of 20 houses on a hillside without grading, streets, or other utilities. Crescent was committed to the FHA, VA, and the purchasers to deliver the homes complete with offsite improvements and utilities. So long as the offsite improvements were incomplete, Crescent could not deliver the homes to the purchasers. It was necessary for Crescent to complete the offsite improvements called for in the contract of April 8, 1954, which Normandy failed to install. The cost of making such improvements *60 was approximately $38,000. Crescent instituted two suits against Normandy and Somerville. In one suit Crescent sought damages for negligence. In the second suit Crescent sued for damages for breach of contract and prayed for equitable relief seeking a decree granting Crescent the right to proceed with the completion of the installation of the offsite improvements, and requiring the defendants to abate the alleged nuisance which they created on the project. Crescent also sought to enjoin the defendants in the suit for equitable relief from negotiating any of the $1,200 promissory notes assumed by Crescent, which remained in the defendants' control. Neither Normandy nor Somerville made an appearance in defense of the actions filed against them. On November 27, 1956, the Court issued its final decree in the equity action in which it awarded Crescent $56,113.52 in damages with interest and costs. Thereafter, Crescent's suit against Normandy and Somerville at law for damages for negligence was dismissed upon the defendants' plea of res judicata. Crescent attempted to offset its claim for damages against Normandy against the $1,200 bearer notes secured by each lot. Normandy, however, had *61 sold the notes on the market and all of them except two fell into the hands of holders in due course. Crescent was unable to collect on its judgment because Normandy and Somerville had so conducted their affairs to render themselves judgment-proof. The judgment obtained against Normandy will be discussed again in these Findings. Petitioner had personally endorsed all of the construction loans from Frederick W. Berens, Inc. Approximately $170,000 had been borrowed by Crescent from Frederick W. Berens, Inc., when it became apparent that Normandy could not be relied on to fulfill its contractual obligations. Petitioner also orally gave his personal guarantee to the suppliers of materials to the Somerville Hill project against losses. On December 30, 1955, Randolph D. Rouse Enterprises issued its check in the amount of $400 payable to the order of Hardee Chambliss. Hardee Chambliss was an attorney and he was paid a $400 retainer to bring the suits on behalf of Crescent against Somerville and Normandy. Randolph D. Rouse Enterprises paid this expense because Crescent had no funds and it was apparent that the venture would result in a loss. It was understood between petitioner and William *62 that any judgment resulting from the action would be assigned to petitioner. Although both petitioner and William recognized that any such judgment would be of dubious value, petitioner considered that it would be the only asset of Crescent from which he could possibly obtain repayment of any advances he had made to the venture. Crescent executed a 90-day negotiable noninterestbearing note dated December 31, 1955, for $400 in favor of petitioner. Crescent's general journal reflected the payment of the expense to Hardee Chambliss by Randolph D. Rouse Enterprises as a debit to "Legal $400," and a credit to "R. D. Rouse $400." On October 30, 1956, Randolph D. Rouse Enterprises issued its check in the amount of $27,700 payable to Fourth Citadel. The checkbook stub for this check recites the following: "Fourth Citadel Const. Corp. - Loan (Somerville)." The general journal of Randolph D. Rouse Enterprises reflects this check as a debit to "Loans Receivable - Crescent Const. Corporation $27,700.00" and a credit to cash on deposit. The $27,700 item was reflected in Fourth Citadel's general journal on October 31, 1956, as a credit to cash on deposit and a debit to construction cost for Somerville *63 Hill. The $27,700 item was reflected in Crescent's general journal by a debit to "Construction Advances Fourth Citadel" and a credit to R. D. Rouse, both dated October 31, 1956. The four items described above, consisting of the amounts of $6,300, $5,600, $400, and $27,700 totaling $40,000, were credited to a ledger account in Crescent's books entitled "Notes Payable - Randolph D. Rouse." As of October 31, 1956, this account reflected a credit balance in the total sum of $40,000. Randolph D. Rouse Enterprises maintained a ledger account entitled "Crescent Construction Corp." The only entries appearing therein are the following three debits: $6,300 on January 31, 1955, $5,600 on June 30, 1955, and $400 on December 30, 1955. The item of $27,700 was arrived at by petitioner's accountant in his annual audit of petitioner's books and records and those of his corporations. Petitioner maintained his books and records on the basis of a calendar year and on the cash receipts and disbursements method of accounting. Most of petitioner's corporations, including Fourth Citadel, maintained their books and records on the basis of a fiscal year ending October 31. By October 30, 1956, the Somerville *64 Hill project was completed and all the bills were submitted. Since the maximum receipts were known, petitioner's accountant was able to determine that Fourth Citadel's expenditures on the Somerville Hill project would exceed all the possible receipts from the project by the amount of $27,700. Since petitioner had personally guaranteed the payment of materialmen in connection with the Somerville Hill project, he paid the $27,700 to Fourth Citadel so that the materialment could be paid. No security was given by Crescent to petitioner for the repayment of any of the advances made by him in connection with this venture. Petitioner never made any demand nor instituted any proceeding to collect on any obligation arising from such advances. All notes and loans payable appearing on the books of Crescent as due and owing to petitioner were written off as uncollectible on the books of Randolph D. Rouse Enterprises on December 31, 1956. The books of Crescent showed that it owed $19,000 to Construction Equipment Corporation, a corporation owned by petitioner which was in the business of renting dirt-moving equipment. Time sheets were kept on the work performed by Construction Equipment Corporation *65 for Crescent, and Crescent was charged the rates other customers were charged for the same work. The $40,000 which petitioner, through Randolph D. Rouse Enterprises, advanced either to Crescent or to Fourth Citadel in connection with the Somerville Hill project, and which was never repaid to petitioner, was deducted by him in his 1956 income tax return as a business bad debt. Crescent did not pay to Rouse or accrue as payable to him any interest with respect to the claimed $40,000 bad debt. In dealings between petitioner and his corporations interest was sometimes computed at the conclusion of the project and before profits were distributed. Crescent's balance sheets as of December 31, 1956, and July 31, 1957, were as follows: CRESCENT CONSTRUCTION CORPORATION
Balance Sheet
December 31, 1956
ASSETS
Current Assets
Cash on Deposit
$ .89
Note Receivable - W. D. Rouse
1,515.97
Land - Somerville Hill (10 lots)
20,646.70
Construction Account (Somerville Hill)
134,199.80
Total Current Assets
$156,363.36
Fixed Assets
Equipment
$ 623.90
Depreciation to Date
358.77
Total Fixed Assets
265.13
Other Assets
Land Deposit (Domany Property)
$ 525.00
Escrow - F. W. Berens
12,310.00
Escrow - Normandy Land Club
2,000.00
Total Other Assets
14,835.00
TOTAL ASSETS
$171,463.49
LIABILITIES AND NET WORTH
Liabilities
Virginia Income Tax Payable
$ 141.80
Notes Payable
R. D. Rouse
$40,000.00
Fourth Citadel Construction
Corporation
35,342.45
F. W. Berens, Inc. (Con-
struction Loan, Somerville
Hill)
86,000.00
Normandy Land Club (Som-
erville Hill)
12,000.00
173,342.45
Total Liabilities
$173,484.25
Net Worth
Capital Stock
$ 10,000.00
Less Deficit
12,020.76
Total Net Worth
(2,020.76)
TOTAL LIABILITIES AND NET WORTH
$171,463.49
CRESCENT CONSTRUCTION CORPORATION
Balance Sheet
July 31, 1957
ASSETS
Current Assets
Cash on Deposit
$ .89
Land Deposit (Domany Property)
525.00
Total Current Assets
$525.89
Fixed Assets
Equipment
$ 623.90
Depreciation to Date
431.60
Total Fixed Assets
192.30
TOTAL ASSETS
$718.19
LIABILITIES AND NET WORTH
LIABILITIES
Virginia Income Tax Payable
$ 141.80
Loan Payable - W. D. Rouse
61.38
Total Liabilities
$203.18
Net Worth
Capital Stock
$10,000.00
Less Deficit
9,484.99
Total Net Worth
515.01
TOTAL LIABILITIES AND NET WORTH
$718.19
*66 Crescent's statement of income for the 5 months ended December 31, 1956, was as follows: Income
Sale-Houses (10)
$143,964.00
Less Cost of Houses
Sold
157,545.41
($13,581.41)
Rental
2,897.12
Total Income
($10,684.29)
Plus Operating Expenses
Depreciation
51.95
NET LOSS
$10,736.24
Petitioner accepted an assignment of Crescent's judgment against Normandy and Somerville in satisfaction of any obligation arising from his advances to the venture and shown as notes or accounts payable on the books of Crescent, because it was the only asset he could get. At the time petitioner agreed to accept the assignment from Crescent, he knew that the claims against Normandy and Somerville were worthless. When Normandy failed to perform its contractual obligations, petitioner's accountant checked into Normandy's financial condition through Dun and Bradstreet, Stone's Mercantile, and the Mount Vernon Bank and Trust Company in Fairfax, Virginia. It was determined by this investigation which took place sometime in 1955 that there was little likelihood of collection of damages from Normandy. A writ of execution on the judgment against Normandy directed to the Sheriff *67 of Fairfax County, Virginia, issued on December 20, 1956, was returned on January 2, 1957, unsatisfied because Normandy had no property. On October 14, 1957, Crescent obtained an order requiring Somerville's attendance before a Commissioner in Chancery for the Circuit Court of Fairfax County, Virginia, to answer interrogatories concerning the estate of Normandy. No property was found from which the judgment could be satisfied. The following is a copy of an entry appearing in the general journal of Crescent dated July 31, 1957: Note Payable Ran-
dolph Rouse
$40,000.00
Cost of houses sold
$40,000.00
To cancel debt to R. D. Rouse. Judgment against Somerville in the amount of $56,000 assigned to Mr. Rouse in payment of this debt. The debit reflected in said journal entry to "Note Payable Randolph Rouse" in the amount of $40,000 was posted in Crescent's ledger to an account entitled "Notes Payable - Randolph D. Rouse." As of July 31, 1957, this ledger account showed a zero balance. Crescent's judgment against Normandy was assigned and transferred to petitioner in the records of the Circuit Court of Fairfax County, Virginia, on December 13, 1957. When petitioner *68 first entered into the venture with Crescent he estimated that the entire profit on the Somerville Hill project would be approximately $40,000. When the project was completed, petitioner's loss was $40,000. In petitioner's opinion, the failure of Crescent to realize approximately $80,000 was attributable to Normandy's default. Instead of completing the project in a period of 5 months, as petitioner had estimated, construction extended due to Normandy's default over a period of approximately 18 months. Consequently, it was necessary for Crescent to incur additional expenses in renewing its commitments with the FHA and VA. Interest on the construction loan from Frederick W. Berens, Inc., at 6 percent during the 18-month period was a considerable expense. Other expenses which were greater than the original estimate because of the delay included taxes, insurance, and salaries. Crescent suffered flood damage which could have been avoided if Normandy had completed its offsite improvements. It was also necessary for Crescent to put in the improvements which Normandy failed to do. Since the 20 lots in Somerville Hill which Crescent purchased were not all adjacent to one another, Crescent incurred *69 greater expense in completing the offsite improvements than would normally be incurred for 20 lots. As hereinbefore noted, Crescent spent approximately $38,000 in installing such offsite improvements. Although the expenses in completing the Somerville Hill project exceeded by far the original estimates, Crescent was unsuccessful on two occasions to gain FHA and VA approval to raise the selling price of the houses. Beginning in 1949 or 1950 petitioner began to loan funds to corporations and partnerships in which petitioner had a proprietary interest. Petitioner has loaned money to purchasers of houses from corporations in which he owned stock. He took second mortgages and notes in return for the money he loaned and deposited the notes for collection in his Randolph D. Rouse Enterprises account. He has loaned money to subcontractors who were employed by his corporations. He has loaned money to builders and contractors who were engaged on projects in which petitioner had no proprietary interest. The loans which petitioner made helped his companies make money, which in turn made money for him. In December 1954 Randolph D. Rouse Enterprises had outstanding loans in the total amount of *70 $379,000. In December 1957, one of the years in issue herein, Randolph D. Rouse Enterprises had outstanding loans in the total amount of approximately $530,500, of which $275,000 were various second trust notes and approximately $254,000 represented loans to corporations in which petitioner had a stock interest. At the time of trial herein petitioner's loans outstanding aggregated approximately $531,000. Many of the loans made by Randolph D. Rouse Enterprises bore interest, which was included in gross income in petitioner's Federal income tax returns. Petitioner reported on his Federal income tax returns for the indicated years the following amounts as interest income from "various second trust notes": Year
Amount
1953
$11,552.08
1954
12,740.09
1955
18,285.88
1956
19,629.84
1957
21,147.64
Petitioner is the principal stockholder in several corporations. The following schedule shows the dates and number of shares of capital stock issued to petitioner and to others in such corporations as of December 31, 1955, and the par value and cost of the shares issued to petitioner: RANDOLPH D. ROUSE
Analysis of Capital Stock Owned in Controlled Corporations
No. of
Shares
Date
Issued
No. of
Par Value
of
Other
Shares
of Shares
Cost of
Stock
Than
Issued
Issued
Shares Issued
Name of Company
Issue
Rouse
to Rouse
to Rouse
to Rouse
Citadel Construction Corp.
1948
6
50
$ 5,000.00
$ 5,000.00
1949
10
1,000.00
1,000.00
1953
12
120
12,000.00
Stock Div.
Balance 12/31/55
18
180
$ 18,000.00
$ 6,000.00
Fourth Citadel Construction Corp.
1951
40
60
$ 600.00
$ 600.00
1953
80
120
1,200.00
Stock Div.
1954
120
180
1,800.00
Stock Div.
1954
(120)
120
1,200.00
1,500.00
Balance 12/31/55
120
480
$ 4,800.00
$ 2,100.00
Fifth Citadel Construction Corp.
1951
40
60
$ 600.00
$ 600.00
1953
80
120
1,200.00
Stock Div.
1954
120
180
1,800.00
Stock Div.
1954
( 60)
60
600.00
750.00
Balance 12/31/55
180
420
$ 4,200.00
$ 1,350.00
Sixth Citadel Construction Corp.
1951
40
60
$ 600.00
$ 600.00
1953
80
120
1,200.00
Stock Div.
1954
120
180
1,800.00
Stock Div.
1954
(240)
240
2,400.00
1,250.00
Balance 12/31/55
0
600
$ 6,000.00
$ 1,850.00
Seventh Citadel Construction Corp.
1951
40
60
$ 600.00
$ 600.00
1953
80
120
1,200.00
Stock Div.
1954
120
180
1,800.00
Stock Div.
1954
( 60)
60
600.00
750.00
Balance 12/31/55
180
420
$ 4,200.00
$ 1,350.00
Construction Equipment Co.
1951
10
90
$ 900.00
$ 900.00
1953
( 6)
6
60.00
60.00
1954
16
384
3,840.00
Stock Div.
1954
( 10)
10
100.00
125.00
Balance 12/31/55
10
490
$ 4,900.00
$ 1,085.00
Constructors, Inc.
1949
10
90
$ 4,500.00
$ 4,500.00
1953
20
180
9,000.00
Stock Div.
1954
( 6)
6
300.00
375.00
Balance 12/31/55
24
276
$ 13,800.00
$ 4,875.00
Virginia Lodge
1953
27
23
$ 2,300.00
$ 2,300.00
1955
( 27)
27
2,700.00
2,700.00
Balance 12/31/55
0
50
$ 5,000.00
$ 5,000.00
Urban Redevelopment Corp.
Common Stock
1949
60,000
$ 600.00
$ 600.00
Preferred Stock
1949
1,245
124,500.00
11,650.00
Balance 12/31/55: Common
0
60,000
$ 600.00
$ 600.00
Preferred
0
1,245
$124,500.00
$11,650.00
*71 As of December 31, 1955, the aggregate indebtedness for which there was no collateral owed to petitioner by his controlled corporations was approximately $111,000. As of December 31, 1956, the amount was approximately $122,000 and as of August 31, 1957, approximately $171,000. Several of these corporations have borrowed substantial sums of money from sources other than from petitioner. Opinion KERN, Judge: The issue presented for our decision is whether respondent properly disallowed a business bad debt deduction of $40,000 claimed by petitioner on a joint return filed with his wife for the year 1956. Respondent contends, inter alia, that the advances in issue which aggregate $40,000 did not give rise to an indebtedness, but that "such advances constituted either contributions by Rouse [petitioner] to the capital of Crescent; personal expenditures of Rouse representing his personal investment in, or contribution to a joint venture; or gifts made by Rouse." Respondent also contends that if any bona fide debts were created herein they were nonbusiness debts but are not deductible as such during either of the years in issue because petitioner failed to prove they became completely *72 worthless during such years. Petitioner contends that the advances were made by him to or for the benefit of Crescent and were bona fide loans creating debts owed to petitioner by Crescent. Petitioner contends that such debts became wholly worthless in 1956 or alternatively in 1957, and are deductible by him as business bad debts in either 1956 or 1957.
Section 166 of the 1954 Code [2] provides that there shall be allowed as a deduction any debt which becomes worthless within the taxable year. Only a bona fide debt qualifies for purposes of section 166. See section 1.166-1(c), Income Tax Regs.; Evans Clark, 18 T.C. 780, affd. 205 F. 2d 353. *73 The initial difficulty in these cases, and a most substantial one, is the determination of what petitioner and his brother William agreed to do in connection with the Somerville Hill venture, what was done by them pursuant to, in modification of, or without reference to this agreement, and the various legal relationships borne by all the parties of this venture to each other during its existence. This difficulty arises by reason of the informality and indefiniteness of their agreement, and the ambiguity and, at times, inconsistency of the actions taken by them subsequent to the agreement due to the close ties of kinship between petitioner and William, the control exercised over Crescent by William (shared to some extent at least by petitioner as a practical matter as the venture progressed), the control by petitioner of Fourth Citadel, and the fact that the circumstances which precipitated the controversy here involved were not anticipated by the parties at the inception of the venture undertaken by them. As we read the record herein, the basic circumstances incident to the Somerville Hill venture were as follows: Petitioner by 1954 had established himself in the business community *74 in which he resided as a successful real estate operator. Acting in most instances through controlled or whollyowned corporations he had acquired and developed numerous pieces of real estate, had constructed buildings (usually residences) thereon, and by their profitable sale had become a relatively wealthy man with an excellent credit reputation. He had available, either directly or through his controlled corporations, a capable staff of employees skilled in the construction business, and skillful and responsible subcontractors. Petitioner's younger brother William, seeking to emulate petitioner's success in the real estate business, but with little experience or capital or credit, organized in 1953 a corporation which was to acquire land, erect houses thereon, and sell the improved real estate. This corporation, referred to in our Findings as Crescent, was started with a formal capitalization of $10,000, $6,000 of which was contributed by William and $4,000 by his relatives (not including petitioner) to which William contributed an additional $2,000 as a "loan." In 1953 and 1954 Crescent built and sold five houses. In the latter year Crescent acquired 6 lots with the option, exercisable *75 in two steps, to buy 14 additional lots in a new subdivision, the owner and developer of which was obligated to complete the improvements thereon such as construction of streets and the installation of sewers and water lines. William proceeded with the engineering and architectural designing necessary for the building of houses on those lots and attempted to get VA and FHA approval for the project and arrange for construction loans. Pending such approval, no construction was done. After negotiations extending over many months William was informed that VA and FHA would not approve the project on Crescent's credit but would give such approval if petitioner would participate in the project and lend to it his credit. He was also informed that construction loans would be available but only if petitioner's credit was also pledged to their repayment. By that time the funds of Crescent had been diminished by current expenses, including the payment of salary to William, and its option to buy the second group of lots was about to expire. Thus Crescent was without the funds necessary for the exercise of its option and without the credit necessary to obtain VA and FHA approval and the necessary *76 construction loans. Under these circumstances William approached petitioner with an invitation to join in this venture. William (or Crescent) was to contribute to the venture the engineering and architectural work already done, the 6 lots already acquired by Crescent, the option to purchase 14 additional lots, and the supervisory services of William. Petitioner was to contribute his credit, the funds necessary to acquire the 14 lots under the options, and the funds necessary for working capital over and above the construction loans which would be available upon petitioner's entrance into the venture. Petitioner was also to make available to the venture the service of construction workers and equipment employed or owned by his various controlled corporations which were at that time not engaged in any other project (to be paid for at the going rates), and to arrange for the services of necessary subcontractors. Upon completion of the project, petitioner and Crescent were to divide the profits. Petitioner, who, as we have said, was an experienced and successful real estate operator, carefully considered William's proposal and, after estimating the construction costs and satisfying himself *77 as to the available construction loans, concluded that the venture would result in a profit of approximately $40,000 and would require an outlay on his part of a much smaller amount. Accordingly, petitioner accepted William's proposal and agreed to participate in the venture having to do with the construction and sale of houses on the 20 lots then owned by or available to Crescent in the subdivision known as Somerville Hill. After petitioner and William had reached and agreement on the crucial question of whether petitioner should join in this venture, the following steps were taken: (1) Petitioner was made a vice president of Crescent in which he held no stock, (2) petitioner twice advanced directly to Crescent funds necessary for the exercise of its options and the acquisition of the 14 lots, (3) these advances were denominated "loans" on the books of petitioner and Crescent, (4) approximately 5 months after the first advance and 15 days after the second advance Crescent gave to petitioner a noninterestbearing note payable in 90 days for $11,900, the total amount of these advances, (5) to some extent petitioner participated in the operation of the venture through his controlled *78 corporation Fourth Citadel, (6) petitioner furnished the labor and equipment needed for the venture, (7) construction loans were received and disbursed by Fourth Citadel, (8) bills of subcontractors and for material were rendered to and paid by Fourth Citadel after the approval of William, (9) expenses for labor and equipment were charged to Fourth Citadel, (10) amounts paid out by Fourth Citadel in connection with the venture were carried on the books of Fourth Citadel and Crescent as loans receivable by Fourth Citadel and loans payable by Crescent in running accounts to which were credited amounts received by Fourth Citadel from construction loans and otherwise, and (11) petitioner guaranteed the payment of bills for materials used in the venture (which were charged to Fourth Citadel). At the time petitioner agreed to enter into this venture and the foregoing steps implementing the agreement were initiated, neither petitioner nor William anticipated the possibility that the venture might result in a loss. They both intended that any advances made by petitioner in connection with the venture should be repaid to petitioner from profits. However, by reason of the unforeseen events *79 detailed in our Findings, the venture proved unprofitable, and in the latter part of 1956 petitioner and his accountant determined that the amounts which would be received by the venture were less than the claims of creditors (not including any claims of petitioner) by the amount of $27,700. Since these creditors were materialmen and subcontractors who had been guaranteed payment by petitioner and since Fourth Citadel had incurred these debts in its name on behalf of the venture, petitioner gave his check in this amount to Fourth Citadel which in turn eventually paid these creditors. On December 30, 1955, petitioner paid an attorney the sum of $400 in order that legal action could be taken by Crescent against the defaulting developer of Somerville Hill. Crescent on the next day executed its note to petitioner in this amount. At his time Crescent had no funds of its own. It was apparent to all concerned that it would receive no profits from the venture, that the only asset it had which might be availed of to diminish the losses of the venture was its chose in action against the developer of Somerville Hill and that this was of extremely doubtful value. It was understood between petitioner *80 and William that any judgment resulting from this chose in action was to be assigned to petitioner. When petitioner paid the attorney fees he knew that he could be repaid only if and when collections were made on the judgment assigned to him by Crescent. Petitioner's contention is that all of these advances totaling $40,000 are deductible in either 1956 or 1957 as business bad debts owed to him by Crescent. By amended answer respondent alleged, inter alia, that if the $27,700 advanced to Fourth Citadel should be considered a debt, it constituted a debt of Fourth Citadel to petitioner rather than a debt of Crescent. In his reply to this amended answer petitioner alleged in the alternative that if this advance be considered a debt of Fourth Citadel it was a business bad debt becoming worthless in 1956 or 1957. However, no evidence was submitted having to do with the financial condition or solvency of Fourth Citadel during those years and, on brief, petitioner's contention is that Fourt Citadel was merely acting as agent for Crescent and that in law and fact any debts arising from the advances were debts of Crescent to petitioner. Thus the question (or questions) before us is whether *81 the advances made by petitioner in connection with the Somerville Hill project resulted in debts owed to him by Crescent and, if so, whether they were business bad debts which became worthless in either 1956 or 1957 and our decision is limited to that question (or questions). The relevant criteria to be considered in determining whether amounts advanced to a corporation constituted bona fide indebtednesses as opposed to a capital contribution in the enterprise are the following: (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions. Montclair, Inc., v. Commissioner 318 F. 2d 38, 40. *82 See also Wilbur Security Co. 31 T.C. 938, 948, affd. 279 F. 2d 657. No one of the above factors is controlling and each case must be decided on the basis of its own facts. John Kelley Co. v. Commissioner, 326 U.S. 521; Gooding Amusement Co., 23 T.C. 408, affd. 236 F. 2d 159, certiorari denied 352 U.S. 1031; Emanuel N. (Manny) Kolkey, 27 T.C. 37, affd. 254 F. 2d. 51. The advances here in issue, totaling $40,000, arise out of four separate advances as follows: (1) Advance of $6,300 to Crescent on January 21, 1955, to enable Crescent to exercise an option to acquire 8 lots. (2) Advance of $5,600 to Crescent on June 15, 1955, to enable Crescent to exercise an option to acquire 6 lots. (3) Advance of $400 on December 30, 1955, to an attorney as a retainer in connection with litigation brought by Crescent against Somerville and Normandy. (4) Advance of $27,700 on October 30, 1956, to Fourth Citadel to pay suppliers for materials and work performed on the Somerville Hill project. On the basis of this record, and taking all of the circumstances into consideration, *83 we think it must be concluded with respect to the advances of $6,300 and $5,600 to enable Crescent to exercise options to obtain lots that the petitioner did not intend to create a bona fide indebtedness between himself and Crescent, and that petitioner is not entitled to the bad debt deduction claimed. We believe that these amounts represented petitioner's capital contribution to the joint venture he undertook with his brother to build 20 houses in Somerville Hill. Petitioner points out that notes were given for the advances made, and that the books and records of Crescent, petitioner, and Fourth Citadel reflected the advances as amounts owed by Crescent to petitioner. However, the giving of a note is not in itself conclusive of a bona fide debt. Republic Steel Corporation v. United States, 141 Ct. Cl. 499, 159 F. Supp. 366; Hattie Wolff, 26 B.T.A. 622, and although the fact that the advances were treated on the books and records of the parties as debts owed by Crescent to petitioner is some evidence of the nature of the transactions it is not determinative and *84 it does not compel us to conclude that a bona fide indebtedness was created. Dodd v. Commissioner, 298 F. 2d 570, 578, affirming a Memorandum Opinion of this Court; Wachovia Bank and Trust Company v. United States, 288 F. 2d 750, 758. Nor do we deem it necessary to reach a contrary result for the reason that none of Crescent's stock was issued to petitioner. Sherwood Memorial Gardens, Inc., 42 T.C. 211, on appeal (C.A. 7, Aug. 10, 1964); Foresun, Inc., 41 T.C. 706, on appeal (C.A. 6, April 20, 1964). In determining whether the advances in issue constituted, for purposes of taxation, a valid indebtedness or an equity investment, a significant factor to be considered is "whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business, * * *." Gilbert v. Commissioner, 248 F. 2d 399. In the record before us we find an agreement between petitioner and his brother which was reduced to writing in a memorandum dated June 7, 1955, which provided that Crescent and petitioner's corporation, Fourth Citadel, were to be equal partners *85 in building on the 20 lots in Somerville Hill. All creditors of the project other than petitioner were to be paid before petitioner's purported loans would be repaid. The subordination of the advances to the debts owed to outsiders and the lack of a relatively fixed date upon which petitioner could have demanded a definite sum regardless of profits earned strongly indicate that petitioner's advances were not bona fide debts. Nassau Lens Co. v. Commissioner, 308 F. 2d 39; Farley Realty Corporation v. Commissioner, 279 F. 2d 701, affirming a Memorandum Opinion of this Court. The agreement also provided that the advances would be repaid "in a manner to equalize the equity of each principal," and that "[profit] will be distributed only after all investment equity has been repaid." Profits were to be divided equally between Fourth Citadel and Crescent. These facts indicate that petitioner intended and the parties anticipated that petitioner would participate in the profits of the enterprise as a joint venturer. Thus the initial advances of petitioner as contemplated in his agreement with William constituted "a participation in the pot luck of the enterprise, *86 " Aqualane Shores, Inc., v. Commissioner, 269 F. 2d 116, 119, affirming 30 T.C. 519, and, like risk capital, petitioner's advances bore a substantial risk of the enterprise and were tied up indefinitely with the success of the venture. Camp Wolters Enterprises v. Commissioner, 230 F. 2d 555, affirming 22 T.C. 737, certiorari denied 352 U.S. 826. See also Joseph W. Hambuechen, 43 T.C. - (Oct. 22, 1964). Further, the record persuades us that outside investors would not have made similar advances, another factor which indicates that the advances in question were contributions to capital as opposed to loans. See Nassau Lens Co. v. Commissioner, supra; Gilbert v. Commissioner, supra. Other factors in this record which cause us to believe that the initial advances of petitioner did not constitute a bona fide indebtedness are that although a note was given to petitioner which was signed by Crescent no effort was made to collect thereon, i.e., to share with other creditors, that no interest was provided for therein and none was paid, and that no security to insure repayment was furnished by *87 Crescent to petitioner. See Ludwig Baumann & Co. v. Commissioner, 312 F. 2d 557, affirming a Memorandum Opinion of this Court. With regard to the advance of $27,700 it is obvious that it was made without expectation of repayment by Crescent and, even if we were to consider it an advance to Crescent rather than to Fourth Citadel, it could not be considered as a loan giving rise to a debt. Petitioner, realizing that there was no reasonable expectation of the repayment of this advance at the time it was made, argues that the doctrine of Putnam v. Commissioner, 352 U.S. 82, applies. He contends that the advance was made because of petitioner's guaranty of the payment of materialmen, and therefore the general rule that there must be a reasonable expectation of repayment in order that an advance may be considered a debt is not applicable. However, the rule of the Putnam case is applicable only to those cases in which the guarantor makes payment to the creditors and thereby becomes subrogated to their claims against the principal debtor. Assuming, arguendo, that petitioner is correct in his contention that the advance in question was not to Fourth Citadel but *88 was made through Fourth Citadel to Crescent, we have a situation where the guarantor has made no payments to the creditors guaranteed but has made an advance to the corporate agent for the principal debtor so that the principal debtor can itself pay its creditors through its corporate agent. Under those circumstances there is no subrogation and therefore the Putnam case is not applicable. The $400 advance was also made without any reliance on the general credit of Crescent and without any reasonable expectation at the time of the advance that Crescent would repay it. Again petitioner relies on the Putnam case but with even less justification since this advance was made without any obligation of petitioner arising from a guaranty or otherwise. Since we have concluded that none of the advances made by petitioner resulted in debts owed to him by Crescent, it is unnecessary for us to decide whether petitioner was in the business of lending money to corporations or business enterprises in which he had a proprietary interest or the year, if any, in which debts owed by Crescent became worthless. Decisions will be entered under Rule 50. Footnotes
1. This is petitioner's testimony. However, it was immediately necessary for petitioner to advance $6,300 to Crescent to make it possible for Crescent to acquire 8 lots pursuant to its option.↩
2. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * *
(b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩